**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 21bk07972 |
| Channel Clarity Holdings LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Honorable LaShonda A. Hunt |
| | ) | |

## ORDER DENYING CONFIRMATION OF DEBTOR'S PROPOSED PLAN

Debtor Channel Clarity Holdings LLC ("Debtor") initiated this bankruptcy case under

subchapter V of chapter 11 on June 30, 2021, and timely submitted a Plan of Reorganization on

September 9, 2021 (Dkt. #62) (the "Plan"). Kasey Klaas ("Klaas"), Debtor's largest unsecured

creditor, and The James Streibich Trust of 2002 (the "Trust"), a minority preferred shareholder

of Debtor, (collectively, the "Objecting Parties"), voted against the Plan and filed written

objections to confirmation under 11 U.S.C. §§ 1129(a) and 1191(b).[1] Brock Flagstad

("Flagstad"), Debtor's CEO and second largest unsecured creditor, supports confirmation of the

Plan. Subchapter V trustee Matthew Brash (the "SBRA Trustee") does as well with a few

caveats.

Following a four-day combined contested hearing on confirmation of the Plan and a trial

on Debtor's related adversary complaint and motions, the Court has considered the evidence in

---

[1] Debtor sought unsuccessfully to subordinate Klaas' unsecured claim under 11 U.S.C. § 510(b) in a separate adversary proceeding and an objection in the bankruptcy case. *See Channel Clarity Holdings LLC v. Kasey Klaas*, 21ap00111, Memorandum Opinion dated July 18, 2022, Adv. Dkt. #60; *Order Overruling Claim Objection and Denying Motion to Disallow Klaas Vote* dated July 18, 2022, Dkt. #239. Because Klaas' interests are impaired under the Plan and his dissenting vote is now allowed, the Plan cannot be confirmed consensually under section 1191(a). However, the negative vote from the Trust does not impact the confirmation analysis since none of the shareholder's equity interests are impaired under the Plan. *See Order Disregarding Ballots Filed by Certain Unimpaired Interest Holders* dated Feb. 27, 2022, Dkt. #163.

the record and the written post-trial submissions of the parties.[2]  For the reasons that follow,

confirmation of the Plan will be denied.

## BACKGROUND

This decision constitutes the Court's findings of fact and conclusions of law under Fed.

R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052, and as applied to contested matters

under Fed. R. Bankr. P. 9014(c).

The facts are taken from the pretrial stipulations, witness testimony, and admitted

evidence.  The following witnesses testified at the Zoom hearing held on May 10-12 and 24,

2022:  (1) **Flagstad** – Debtor's representative and the owner of Channel Clarity, Inc. ("CCI"),

the majority common shareholder and alleged majority preferred shareholder of Debtor; (2)

**Klaas** – Flagstad's former business partner; (3) **Eric Olsen** – former President of Debtor; (4)

**Jack Murphy** – former Chief Financial Officer and minority common shareholder of Debtor; (5)

**Jason Hayes**, current lead developer for Debtor; (6) **James Streibich** – owner of the Trust; and

(7) **Brash** – the SBRA Trustee.  In addition, the Court takes judicial notice of the dockets in the

bankruptcy case and adversary proceeding.  *See Inskeep v. Grosso (In re Fin. Partners)*, 116

B.R. 629, 635 (Bankr. N.D. Ill. 1989).

## I.

Debtor is an email marketing firm that sells internet advertisement services to sellers of

goods and services by using consumer data, including personal contact information such as email

addresses, to identify potential customers for its clients.  As described by Flagstad, Debtor is in

---

[2]  Debtor and Flagstad each submitted post-trial briefs in support of confirmation of the "Second Amended Plan of Reorganization," *see* Dkt. ## 229, 230.  But the bankruptcy docket reflects only the original plan filed in September 2021.  *See* Dkt. #62.  Furthermore, to the extent the Flagstad post-trial brief purports to address subordination of Klaas' unsecured claim, Flagstad has not demonstrated a right to be heard on non-confirmation related issues.  Therefore, those arguments will be disregarded.

the business of monetizing data by advertising.  In a nutshell, these companies pay data providers a percentage share based on revenue generated from data leads.

Flagstad first founded CCI in June 2005.  From its inception until today, he has been the sole owner and President/ CEO.  Debtor was subsequently incorporated as a Delaware limited liability company on September 21, 2012.  A week later, CCI transferred its assets and liabilities to Debtor in exchange for 95.87% of Debtor's common units.

Debtor is governed by an Amended and Restated Limited Liability Company Agreement dated September 28, 2012 ("LLC Agreement").  The LLC Agreement was signed by Flagstad as Debtor's CEO, and investors who were classified as either "Common Members" or "Preferred Members." According to Schedule A of the LLC Agreement, CCI holds 93.8% of Debtor's total common units issued (6,942 out of 7,400) and no preferred shares,[3] while the Trust holds 8.3% of Debtor's total preferred units issued (250 out of 3,000).

Currently, Debtor is a small operation with four employees: (1) Jason Hayes, Lead Developer, whose responsibilities include maintaining Debtor's server infrastructure and ensuring proper performance by the data feeds used by Debtor; (2) Tyler Miller, Marketing Manager, whose responsibilities include day-to-day setup of marketing campaigns and tracking their performance with Debtor's revenue; (3) Matthew Paul, Debtor's newest employee who assists with revenue reporting; and (4) Alexandra Markowitz, Debtor's bookkeeper who handles all accounting functions, including preparation of the required monthly operating reports for chapter 11 debtors.  Flagstad explained at the hearing that Debtor was behind on those reports— the last filing went through February 2022—because Markowitz was in Poland attending to family members affected by the current conflict in Ukraine and he had been unable to reach her

---

[3] Flagstad testified that CCI became his personal holding company of his interest in Debtor, and he owns 98% of Debtor's common shares with a 2% option.

for the last couple of weeks.  Debtor currently leases office space that it shares with other

Flagstad-owned affiliates.  However, Debtor's employees shifted to remote operations in March

2020, a practice that is expected to continue.

With respect to Olsen, who resigned in June 2021 around the time of the bankruptcy

filing, Flagstad described him as the day-to-day representative of Debtor.  Since 2016, Olsen had

held himself out as Debtor's President (without objection from Flagstad).  His responsibilities

included running all business operations and communicating with the Board to provide updates

on operational health, strategy, and profit and loss.  Olsen had authority to approve basic

expenses to run the business but was not intimately involved with the financials of the company

and did not perform any accounting functions.

Today, Flagstad occupies multiple roles for Debtor.  He testified that in June 2021, CCI

obtained 69% of Debtor's preferred member shares, a majority controlling interest.[4]  Debtor did

not present an amended LLC Agreement or revised Schedule A showing this change.   In

addition, in 2018, Flagstad held one of three Board member positions.  However, the other two

board members eventually resigned, leaving Flagstad as the sole Board member as of August

2020.  Moreover, with Olsen's recent departure, Flagstad has assumed the role of Managing

Partner of Debtor.

## II.

In carrying out its business model, Debtor relies heavily on data about potential recipients

of advertisements, particularly valid email addresses.  Debtor had previously generated this

consumer data in-house by operating websites and driving traffic to them to get subscribers to

sign up for communications.   Debtor eventually switched to procuring data from outside

---

[4]  Prior to that transaction, neither Flagstad nor CCI owned any preferred units in Debtor.

partners.  Starting sometime in 2016 or 2017, and through September 2018, Debtor had an oral

agreement with Two Screens, a company owned by Flagstad and Klaas.[5]

According to Klaas, Debtor initially purchased data from Two Screens for a flat rate of

$60,000 per month but the terms eventually changed to a 50/50 net revenue share.  Klaas

explained, and Olsen concurred, that the industry standard is generally to track revenue by data

partner.  That means lists of leads are kept separate and when emails are sent to list recipients,

list managers use a unique identifier to apportion the revenue generated from each piece of data.

Because Debtor is essentially paying for performance of data, as measured by the quality of the

lead, Klaas believes this tracking system is the best way to properly value the data received from

a provider.

Olsen did not completely oppose that proposition.  But he did clarify that it is not always

possible to attribute revenue directly to specific pieces of data per partner.  In that situation,

Olsen believed it would be appropriate to loosely approximate value by taking the total revenue

generated minus mailing expenses.  Olsen did not calculate revenue share for Debtor, though.

Instead, Flagstad managed the business relationship with Debtor's data providers.  Flagstad

conceded the technology exists to track revenue by data source but he did not agree that was

necessarily the best approach.  He concurred with Olsen that net revenue could be calculated by

subtracting total revenue from direct mailing expenses and dividing that number in half to

determine the 50% split.  Flagstad maintained it was standard practice to pay revenue partners

net 60 to account for the time it takes to collect the money.

In September 2018, Two Screens abruptly stopped providing data to Debtor.  Klaas

accused Flagstad of giving Two Screens data to Debtor without proper compensation, as he

---

[5] Two Screens obtained its data from One Screen, a company owned solely by Klaas.

thought Debtor owed Two Screens over $100,000.  Klaas filed a proof of claim in this

bankruptcy case on behalf of Two Screens for $608,000 that was later withdrawn.  After Two

Screens cut off its data supply, Debtor scrambled to find other providers before Flagstad decided

to start his own company, Oxford Marketing, which eventually became Oxford Media.  By 2019,

Debtor was procuring all its data from Oxford Media.

Similar to the arrangement with Two Screens, Debtor did not enter into a written

compensation agreement with Oxford Media.  Olsen testified that he was not involved in

negotiating the deal between Oxford Media and Debtor; Flagstad controlled the terms.  Olsen

thought Oxford Media was paid $60,000 per month for data prior to the bankruptcy filing.[6]  At

the time of the hearing, Oxford Media provided 90-95% of Debtor's data, with the remainder

being obtained from other smaller providers, Media 717 and Propath Media.  Oxford Media is

owned solely by Flagstad and currently derives 10-15% of its revenue from Debtor.  Flagstad

said that he spends a majority of his time running that business.

Hayes, Debtor's lead developer and only programmer, built the system that houses the

data.  He clarified that Debtor buys data through third parties who send leads real-time as they

come into websites.  Debtor then pushes the data through an outside cleaning service that

validates email addresses and automatically uploads information into mailing accounts.  Debtor's

system can report the total number of records sent by provider, but it does not track revenue

generated from each record.  Hayes did not know the source of leads for the Oxford Media data.

But he was employed by Debtor when it received Two Screen data, and in comparing the quality

---

[6] As a part of cash collateral negotiations at the beginning of the case when Klaas' lien still afforded him
secured creditor status, Debtor agreed to cap monthly data payments to Oxford Media at $30,000.  That arrangement
apparently continued even after the cash collateral order expired.

of the data between the two providers, he found that the Oxford Media leads had a greater

acceptance rate and were filtered out less with fewer rejected email addresses.

### III.

Prior to forming Debtor in 2012, Flagstad and Klaas were equal owners of FK Holdings,

an Illinois limited liability company.  Relations between the business partners deteriorated after

Klaas asserted that he was entitled to a 30% ownership share in CCI.  The dispute was resolved

in September 2012 through a series of transactions involving an agreement for Klaas to sell his

membership interest in FK Holdings to Flagstad and to release all claims arising out of the

business relationship with Flagstad and others.  Debtor guaranteed payment through a

promissory note with Klaas.  When Debtor did not pay according to the terms of the note, Klaas

sued in state court and obtained a judgment for $1.83 million in May 2021.  Klaas immediately

froze Debtor's bank accounts, thereby crippling operations.  Shortly thereafter, Flagstad began

the process of securing approval for Debtor to seek chapter 11 bankruptcy protection.

The steps taken by Flagstad as CEO and sole Board member of Debtor are detailed in the

Court's rulings denying the Objecting Parties' attempts to dismiss the bankruptcy petition as

unauthorized and need not be repeated here.  *See Order Denying Klaas Motion to Dismiss*

*Chapter 11 Bankruptcy Petition* dated Feb. 25, 2022, Dkt. #165; *Order Denying Streibich Trust*

*Motion to Dismiss Chapter 11 Bankruptcy Petition* dated Feb. 17, 2022, Dkt. #159.  To

summarize, Flagstad converted over $1 million in alleged personal loans to Debtor from 2016-

2019 into a security interest, issued a capital call to preferred members for the sale of additional

preferred units in Debtor, and when no one responded by the deadline, purchased enough

preferred shares (by leveraging his existing note and infusing cash) to become the preferred

majority member and provide the requisite consent for the bankruptcy filing.  Flagstad was on all

sides of the transaction as the lone signatory in his capacity as Manager of Debtor, individual

purchaser, and President of CCI.  Not surprisingly, the Objecting Parties continue to oppose

Debtor's bankruptcy proceeding and proposal of any plan, as they contend Flagstad lacked

proper authority to institute these proceedings.

## IV.

The Plan calls for the continuation of Debtor's business with its current employees, cost

reductions once the office lease is rejected and associated utilities end, and an ongoing

relationship with Oxford Media to purchase data at the pre-petition cost of $60,000/month while

Debtor also seeks to diversify its base of providers.  The proposed term is five years.  Debtor no

longer has any secured creditors.  The Plan anticipates unsecured creditors being paid between

45% and 100%, depending upon resolution of Debtor's subordination complaint.  Flagstad has

also agreed to voluntarily subordinate his unsecured claim to all other unsecured creditors except

Klaas.

The Objecting Parties have actively opposed plan confirmation, primarily contending that

Flagstad's actions in causing the bankruptcy to be filed without corporate authority, and his

conflicts of interest as an owner of affiliates and creditors of the Debtor, should disqualify him

from playing an outsized role—or perhaps any role at all—in a reorganized Debtor.  They argue

that Flagstad is not proceeding in good faith as Debtor's representative and the proposed Plan is

not fair or equitable.  The SBRA Trustee submitted a memorandum affirming his belief that the

financial data supports Debtor's ability to generate revenue and repay debts that also attached

supporting documentation concerning a significant amount of the pre-petition loans claimed by

Flagstad.  Still, he also proposes involvement of a third-party administrator—someone other than

Flagstad—to oversee administration of the Plan.

The Court has jurisdiction under 11 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  Confirmation of a plan is a core proceeding under 28 U.S.C. §§ 157(b)(2)(L).

## DISCUSSION

Debtor asserts that the Plan meets all requirements for confirmation under the Code, but the Court cannot agree with that statement.  The Plan as drafted is not confirmable as a nonconsensual subchapter V plan.  Accordingly, the objections of the Objecting Parties will be sustained in part and overruled in part as set forth herein.

### I.   Plan Contents under 11 U.S.C. § 1190

A plan filed in a chapter 11 case under subchapter V need not be accompanied by a separate disclosure statement unless the court rules otherwise.  11 U.S.C. § 1187(C).  However, section 1190 does identify information that must be included in every subchapter V plan.  Those requirements are not fully met here.

#### A.  History of the Debtor

The Plan contains a brief history of Debtor's business operations as recounted, *supra,* in the Background section.  Section 1190(1)(A) is therefore satisfied.

#### B.  Liquidation Analysis

Included in Part XVI of the Plan is a liquidation analysis that describes Debtor's approximate liabilities of $50,000 in administrative claims, $10,885 in priority tax claims, and about $4.2 million in general unsecured claims. Debtor's assets total approximately $267,523, including about $220,000 in cash (as of September 22, 2021)[7], $42,000 of accounts receivable,

---

[7] Debtor's cash position at the time of the May hearing appears to be around the same amount as stated in the liquidation analysis, but some confusion remains.  Debtor's most recent monthly operating report from February 2022 reflected $278,359 of cash on hand (Dkt. #188).  The SBRA Trustee testified based on a cursory review of Debtor's most recent bank statements, that Debtor had experienced a cumulative net cash increase of "$159,000 or

and an IP address valued at $10,000. After approximating a cost of liquidation sale at 10% of gross sales proceeds, the Plan estimates a distribution to unsecured creditors of $190,300 in the event of a hypothetical liquidation.

Debtor asserts that the Plan will provide unsecured creditors with a larger payout than in a liquidation. Neither of the Objecting Parties disagree. The Plan details two scenarios for treatment of the $4.2 million in unsecured claims. "Scenario A" is where the Klaas Claim is not subordinated and is included among the unsecured claims resulting in a dividend of 45.35%.[8] "Scenario B" involves a subordinated Klaas Claim and 100% recovery for the remaining unsecured claimants. Debtor assumed throughout the Plan—wrongly, it turns out—that subordination under Scenario B would be the end result. Nevertheless, at trial and in his post-trial brief, Flagstad estimated an 83% or 84% recovery for unsecured creditors if a plan is confirmed under a scenario that accounts for the denied subordination of Klaas' Claim, Flagstad voluntarily subordinating to every other claimant except Klaas, and the disallowed and withdrawn unsecured claims of the Trust and Two Screens, respectively.

Although the Court is not entirely sure how Flagstad's subordination might impact distributions to Klaas and others, there is ample evidence in the record to conclude that applying any of the contemplated scenarios would provide a far greater payout to unsecured claimants than the estimated amount available in a liquidation. Section 1190(1)(B) is therefore satisfied.

### C. <u>Financial Projections</u>

---

something like that." Hearing Transcript at pp. 738-39. Flagstad testified that after paying Debtor's counsel's fees, Debtor had approximately $130,000 cash on hand. Hearing Transcript at p. 374.

[8] After the Plan was proposed, the Court entered orders disallowing the Trust claim as unsecured and allowing it as a proof of interest (*Order Disallowing Claim #12 of the James Streibich Revocable Trust of 2002 as a Secured Claim* dated Oct. 21, 2021, Dkt. #83) and avoided the lien on the Klaas Claim thereby rendering it unsecured. (*Order Granting in Part, Denying in Part Motion for Summary Judgment,* 21ap00111, dated Jan. 13, 2022, Adv. Dkt. #32).

A plan must include financial projections that demonstrate the debtor's ability to make payments. The Plan contains that information in Exhibit A and states the numbers were prepared by its management, i.e., Flagstad, and included the involvement of the SBRA Trustee who testified in support of those figures. The projections estimate future quarterly revenue through the third quarter of 2026, projecting a gradual increase in revenue from a predicted $628,820 in the fourth quarter of 2021 to a predicted $707,742 in the third quarter of 2026.

The Trust attacked the trustworthiness of the financial projections, arguing that Flagstad was the "one source of information" for the projections and no "audited financial statement" or "forensic audit" was provided. The Trust contends that Debtor failed to introduce independent evidence to substantiate these feasibility projections that are based on "untruths in accounting." However, nothing in the Code requires an audit or independent verification of a debtor's financial projections. "The creation of a liquidation analysis and financial projections is not an exact science, so the Courts typically defer to the debtors' projections, subject to cross examination and/or a competing set of projections." *In re Lost Cajun Enters., LLC*, 634 B.R. 1063, 1073 (Bankr. D. Colo. 2021). Neither the Trust nor Klaas—who also took issue with Debtor's numbers—offered alternative projections for the Court to consider.

Furthermore, even if the Objecting Parties are correct that Flagstad may not be the most credible source, the SBRA Trustee testified convincingly that he not only had a hand in preparing the financial projections but has also reviewed them and concludes they show a viable path forward for Debtor. As the subchapter V trustee, his primary duty is to facilitate development of a consensual plan of reorganization. 11 U.S.C. § 1183(b)(7). The SBRA Trustee's expertise as a financial advisor is integral to this process of attempting to bridge the gap between debtors in distress and creditors seeking repayment. The SBRA Trustee found that

Debtor's monthly operating reports have shown a net *increase* in cash reserves of about $159,000.  The Objecting Parties have not identified any basis for the Court to question the veracity of his corroborating statements.  Given the positive indicators of Debtor's continued profitability in the year that this case has been pending and the lack of any compelling reason presented by the Objecting Parties to distrust these financial projections, the Court finds that Debtor has met its burden of production and section 1190(1)(C) is therefore satisfied.

### D.  Submission of Post-Petition Income to the Supervision/Control of the Trustee

A plan must provide for the submission of all or a portion of the subchapter V debtor's post-petition income from future earnings to the supervision and control of the trustee "as is necessary for the execution of the plan."  11 USC § 1190(2).  Although this language could be seen as duplicative of the requirement from section 1191(c)(2)(A) that "*all* the projected disposable income of the debtor . . . be applied to make payments under the plan" (emphasis added), courts have treated section 1190(2) as an investigation of whether a subchapter V plan provides for an appropriate level of involvement from the subchapter V Trustee.  For example, in *In re Pearl Res. LLC*, 622 B.R. 236 (Bankr. S.D. Tex. 2020), the bankruptcy court required the debtor to amend its plan such that the Trustee, and not the debtor itself, would be charged with making payment disbursements.  *Id.* at 247.

In this case, the Plan calls for distributions "to be made from proceeds realized from the continued operations of the Debtor's business *by the Debtor*" (emphasis added), meaning the Plan contemplates having Flagstad or someone under his control disburse plan payments.  However, the Court will not approve a plan with that provision.  First, Debtor has not adequately explained why the default method under section 1194(b) of the subchapter V trustee making payments in a nonconsensual plan is not warranted.  Second, the Court finds compelling the

12

SBRA Trustee's proposal for outside administrative involvement post-confirmation—an idea

with which the Objecting Parties generally concur.  Expanding the circle of control and access

within Debtor to include a credible third-party to oversee the finances is necessary given the

glaring deficiencies in Debtor's current management structure that are discussed in detail, *infra*.

Accordingly, Debtor must amend its plan to provide for disbursements by the SBRA Trustee or

another approved neutral plan administrator to satisfy section 1190(2).

## II.    Confirmation Requirements for a Nonconsensual Subchapter V Plan

Because the Plan in its current form does not comply with section 1190, it is not

confirmable.  Assuming Debtor will fix the issues already identified, the Court has proceeded

with reviewing the Plan under section 1191, and now concludes that those requirements are not

fully satisfied here either.

Section 1191 contains the "essential elements of confirmation of a Subchapter V plan."

*In re U.S.A. Parts Supply*, 630 B.R. 487, 492 (Bankr. N.D.W. Va. 2021).  One key change is that

traditional requirements for confirmation of a chapter 11 plan are modified such that section

1129(b) does not apply.  However, section 1129(a) remains applicable, except for paragraph

(a)(15).  For a plan to be confirmed consensually, section 1129(a)(8)—acceptance by all

impaired classes—is required.

Here, the Plan proposes the following classes and types of claims:

- Administrative claims for Debtor's attorney fees and the SBRA Trustee fees, which
  are described as unimpaired;

- Wage claims under section 507(a)(4) of $10,885 belonging exclusively to Olsen,
  Debtor's former President, which are described as unimpaired;

- Class 1: Secured claims.  Although Flagstad initially filed a proof of claim for $790,898.99 and classified $672,651.94 of that claim as secured, he later filed an amended proof of claim reclassifying the entire claim as unsecured (Proof of Claim 8-2, filed Jan. 20, 2022).  Klaas likewise filed a secured claim in the amount of $1,835,953.23, but Debtor successfully avoided the lien, such that the Klaas Claim is deemed unsecured. *See* n. 8, *supra.*  As a result, no secured claims exist, and Class 1 is now empty.

- Class 2: General unsecured claims.  The Plan estimates this class contains about $4 million in general unsecured claims, including the allowed Klaas Claim and excluding the disallowed Trust claim and withdrawn Two Screens claim.  Flagstad testified that after subordinating his claim to all Class 2 creditors except Klaas, the partial, pro-rata return on claims would be approximately 83% or 84%.

- Class 3: Shareholder interests.  The Plan states that Debtor's "preferred and common members will maintain their interests."  The Trust is included in this category.  *See* n. 8, *supra.*

Debtor received four ballots from Class 2 claimants accepting the Plan for a total amount of $308,012.96 and received one ballot from Class 2 claimant Klaas rejecting the Plan for a total amount of $1,835,953.  Since the vast majority in amount of Class 2 claims from ballot-casting creditors is held by Klaas and he voted against the Plan, Class 2 is an impaired class which has not accepted the Plan.  As such, confirmation is possible only under section 1191(b) as a nonconsensual plan.

Specifically, a nonconsensual subchapter V plan must be confirmed if two conditions are met.  First, the plan must satisfy all applicable confirmation requirements in section 1129(a)

other than section 1129(a)(8) (providing that all classes vote to accept the plan or not be impaired

by the plan), section 1129(a)(10) (requiring at least one impaired class to accept the plan), and

section 1129(a)(15) (requiring individual debtors to pay unsecured creditors in full or devote

allocated projected disposable income to the plan).  Second, the plan must not discriminate

unfairly against the non-consenting classes and be fair and equitable towards non-consenting

classes and their claims.  Again, Debtor satisfies some but not all those requirements.

## A. <u>Confirmation Requirements under 11 U.S.C § 1129(a)</u>

### 1. <u>Section 1129(a)(1)</u>

Section 1129(a)(1) requires a plan to "compl[y] with the applicable provisions of this

title."  When discussing this requirement, courts often analyze whether a plan classifies claims

and interests properly pursuant to §§ 1122 and 1123.  *See In re Pearl Res. LLC*, 622 B.R. at 236

(*quoting* H.R. Rep. No. 595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 989, 95th Cong., 2d

Sess. 126 (1978), U.S. Code Cong. & Admin. News 1978, pp. 5963, 6368, 5787, 5912).

The Court has outlined the proposed organization of the various classes.  Debtor's largest

group of claimants is the general unsecured creditors in Class 2.  A defect exists in this iteration

of the Plan because Debtor failed to provide for a scenario where the Klaas Class is not

subordinated.  Klaas holds the largest claim at $1.83 million, with Flagstad not far behind at

$790,000.  Flagstad is willing to subordinate his general unsecured claim to all other creditors

except Klaas.  However, Debtor has never filed an amended plan reflecting what that would

entail.  Flagstad asserts that unsecured claimants will receive at least 83% but only if Flagstad is

not subordinated to Klaas.  In other words, the Plan lacks clarity on where Klaas falls on the

spectrum if every other unsecured creditor except him has priority in payment over Flagstad.

It is entirely possible that the Klaas Claim would belong to its own impaired class which, as discussed below, may constitute discrimination against Klaas as a claimant.  Again, the idea of Flagstad willingly subordinating his claim was floated at the confirmation hearing and has been mentioned in the written briefs, but that promise appears nowhere in the Plan.  Under the current provisions, the Klaas Claim may still be included in Class 2, but the Court need not speculate on that point.  Debtor will have the chance to propose an amended plan that fully delineates how the Klaas Claim will be treated vis-à-vis Flagstad's unsecured claim now that the Court has determined that subordination is not warranted under section 510(b).

Aside from that unresolved issue, the Court finds that the Plan's classification of claims is otherwise not likely to cause concern.  But judgment will be reserved on this point until Debtor files another plan.

### 2.  <u>Section 1129(a)(2)</u>

Section 1129(a)(2) requires compliance "with the applicable provisions of this title."  As discussed throughout this Order, Debtor does meet that requirement, and therefore the Plan cannot be confirmed.

### 3.  <u>Section 1129(a)(3)</u>

Under section 1129(a)(3), a plan must have been "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).  The term "good faith" is not defined by the Code, but it is "interpreted to mean that there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *Matter of 203 N. LaSalle St. P'ship,* 126 F.3d 955, 969 (*quoting In re Madison Hotel Assocs.*, 749 F.2d 410, 424–25 (7th Cir.1984).

To be filed in good faith, a plan must have "a true purpose and fact-based hope of either 'preserving [a] going concern' or 'maximizing property available to satisfy creditors.'" *In re S. Beach Sec., Inc.*, 606 F.3d 366, 376 (7th Cir. 2010) (*quoting Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship,* 526 U.S. 434, 453, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999)). To find that a plan does not comply with section 1129(a)(3) generally requires "misconduct in bankruptcy proceedings, such as fraudulent misrepresentation or serious nondisclosures of material facts to the court." *In re River Vill. Assocs.,* 161 B.R. 127, 140 (Bankr.E.D.Pa.1993), *aff'd,* 181 B.R. 795 (E.D.Pa.1995). The focus of a good-faith inquiry under the Code is the plan itself. *Madison Hotel,* 749 F.2d at 425; *SM 104 Ltd.,* 160 B.R. 202, 244 (Bankr. S.D. Fla. 1993). Still, the court's analysis of a plan will be done in view of the totality of the circumstances surrounding its development and proposal. *Id.*

This is the main point of contention for the Objecting Parties. The Trust spends the bulk of its post-trial brief, and Klaas devotes a significant portion of his as well, to unpersuasively rehashing their arguments that Flagstad lacked proper corporate authority to proceed and as a result, every action by Debtor, including proposing a plan, is taken in bad faith. The Court has repeatedly explained why neither Klaas, as a creditor, nor the Trust, as a minority preferred member, has shown that this Court was divested of subject matter jurisdiction over Debtor's bankruptcy proceeding, including the confirmation process.[9] That prior decision, which Debtor correctly characterizes as law of the case, governs. In it, the Court narrowly held that dismissal of the petition was not required under the facts presented. Nothing argued by Klaas or the Trust at the hearing or in their post-trial briefs has convinced the Court to reconsider its ruling.

---

[9] For the same reasons stated in the Order denying the motion to dismiss, any challenge to the Court's jurisdiction is overruled.

Indeed, the Objecting Parties erroneously proceed as if the purpose of this confirmation hearing was to delve into Flagstad's alleged mismanagement of Debtor pre-petition and his motives in positioning the company to declare bankruptcy. Even Flagstad in his post-trial brief intimates—wrongly—that the hearing somehow affirmed the propriety of his actions. Nothing is further from the truth. Simply put, the limited inquiry before the Court is whether the Plan is confirmable. To the extent the Objecting Parties believe that Flagstad is engaging in *post-petition* behavior that might impact his ability to continue to successfully operate Debtor, that could be relevant for purposes of the good faith analysis. But to waste time at a hearing on plan confirmation continually rehashing their past disagreements about their business dealings misses the mark entirely.

Any suggestion that the Trust lacked timely notice of the case that prevented it from challenging Flagstad's assertion of preferred majority status that conferred authority to initiate the bankruptcy is belied by the Trust's active participation in this case starting in September 2021 when it filed a proof of claim. Indeed, in November 2021, the Trust filed a detailed objection to the application for compensation of Debtor's counsel, and specifically called into question Debtor's authority to proceed in bankruptcy, but then failed to appear at the scheduled hearing to press the contention. In sum, the Trust remained silent along with other preferred members of Debtor who have never made any attempt to seek direct relief against Flagstad from this Court or any other court, for that matter, in the year this bankruptcy case has been pending. In doing so, they ratified Debtor's June 2021 bankruptcy filing.

The only relevant question before the Court now is whether the *plan* was filed in good faith, not the petition and bankruptcy case in general. *See Madison Hotel,* 749 F.2d at 425; *SM 104 Ltd.,* 160 B.R. at 244. A demonstration of the Plan's bad faith would require a showing of

"fraudulent misrepresentation or serious nondisclosures of material facts." *In re River Vill. Assocs.,* 161 B.R. at 140.  The Objecting Parties have not met that burden.  There is simply no evidence in the record to show that since the bankruptcy was filed, Flagstad has engaged in the type of misrepresentation or nondisclosure that would warrant a finding of bad faith under section 1129(a)(3).

On the other hand, the Court will not confirm a plan affirming that Flagstad's claimed preferred majority status is valid, as that issue is not squarely before the Court.  Contrary to the misconceptions of the Objecting Parties and Flagstad, the point of this hearing was not to resolve the facts pertaining to Flagstad's pre-petition actions.  The Court concluded in denying dismissal of the bankruptcy case that the shareholders who could have objected to this filing—a preferred majority membership—slept on their rights.  On its own, the Trust holds only an 8% preferred interest, a minority that would not have changed the outcome.  The testimony at trial suggests that Debtor has not had a functioning Board in years and certainly no checks and balances concerning Flagstad's handling of the finances.  That may ultimately be problematic enough to hinder Debtor's likelihood of succeeding in this bankruptcy case.  But those facts do not provide a basis for denying Debtor any chance at all to attempt to reorganize.

Klaas' emphasis on the relationship between Debtor and Oxford Media, Flagstad's company from which Debtor purchases 95% of its data, as indicative of bad faith is sorely misplaced.  That Flagstad operates on both sides of the deal could potentially present a conflict of interest with his fiduciary duties to Debtor's creditors and shareholders, but Klaas lacks any proof to back up that accusation.  After all, Debtor was paying $60,000 per month to purchase data from Two Screens, the company owned by Flagstad and Klaas, which is the same spending cap the Plan proposes here.  While Klaas criticizes Debtor for agreeing to pay Oxford Media the

same amount merely because Flagstad owns the company, that argument is not compelling.  In

the end, Klaas's real complaint is that Flagstad is somehow choosing to make Debtor less

profitable, and thereby enriching his personal coffers, by not entering into a written revenue

sharing agreement and calculating net revenue properly.

But the Court is not at all persuaded that Debtor's payments to Oxford Media are made

with the intent to purposely limit Debtor's profits or are excessively high.  While the nature of an

insider transaction often warrants stronger scrutiny, based upon the evidence presented, the

payments to Oxford Media appear quite reasonable.  The voluminous testimony about the nature

of data provided by Oxford Media and the competitive environment of this industry made it clear

that data suppliers provide a highly specific, complex product.  Many factors go into selecting

partners and predicting which revenue deals will prove most lucrative.  Regardless of how Klaas

spins this, he and Flagstad are basically competitors.  Debtor has been profitable over the years

with Flagstad at the helm and Flagstad has worked in this field for quite some time.  The Court

sees no reason to prefer or substitute Klaas' business judgment about how Debtor should operate

over that of Flagstad.

In scrutinizing the data cost from Oxford Media relative to the quality, the Court places

the most weight on the testimony of Hayes, Debtor's lead developer who opined that the Oxford

Media data was equally or more valuable than that from Two Screens: Debtor is "seeing a

greater acceptance rate of the data," meaning "less of it is getting filtered out," and "we are

getting less just fraudulent e-mail addresses . . . where the domain doesn't actually exist."

Hearing Transcript at pp. 452-53.  This testimony is the best evidence the Court has from a

reliable source about the worth of the data to justify the cost.[10]

---

[10] The Court was presented with conflicting testimony about an alleged statement by Olsen, when he was
Debtor's President, to Streibich, as a shareholder, that the Objecting Parties characterize as an admission of a party

In addition, Flagstad has adhered to the suggestion of the United States Trustee for Debtor to diversify its data sources away from just Oxford Media. Debtor now receives about 5% of its data from other sources and plans to continue with that diversification. Decisions about data sources seem inherently technical and complex in the world of email marketing. Absent evidence of bad faith dealings, that decisionmaking should remain within the province of Debtor. The Objecting Parties have not shown that the proposed payments to Oxford Media are either so excessive or improper that they suggest bad faith.

Finally, the Objecting Parties complain that Debtor has not investigated Flagstad and all his alleged conflicts of interest. But they did not present reliable evidence at trial to support the charge that conflicts exist or that Debtor is neglecting its fiduciary duties as a debtor-in-possession. If the Objecting Parties believe Debtor is falling short of its obligations, the Code provides a remedy in section 1185(a).

The Plan currently passes muster under section 1129(a)(3). However, a future amended plan must still satisfy the good faith standard relative to the contents of the new plan. Still, the Court is not inclined to address the same arguments about the circumstances surrounding the filing of the bankruptcy petition or Debtor's payments to Oxford Media further. Those objections are specifically overruled.

---

opponent that is admissible for the truth of the matter asserted. Streibich testified that "[Olsen] represented to [him] that the $60,000 a month [being paid by Debtor for data from Oxford Media] was not worth more than $3- or $5,000." Hearing Transcript at pp. 801-802. If true, that would prove Debtor was severely overpaying for Oxford Media data. However, when Olsen himself was asked at trial, "Did you ever tell James Streibich that the value of the Oxford Media data was less than $60,000 a month?" his response was, "No." Hearing Transcript at p. 96. In assessing the credibility of these two witnesses and the relative weight to afford each, the Court finds Olsen's testimony far more believable. The Court had a chance to observe his demeanor and found him convincing. He was testifying as to his own words and would thus be more likely to properly recall the contents of the conversation than Streibich. More importantly, Olsen is a former employee who is no longer involved with Debtor, which makes him a more disinterested witness than Streibich who has been embroiled in multiple lawsuits against Flagstad. As such, the Court credits Olsen's testimony denying that he called into question the value of the Oxford Media data to Streibich.

#### 4.   Section 1129(a)(4)

Section 1129(a)(4) provides that payments for services in connection with the Plan must be approved by, or subject to approval by, the Bankruptcy Court as "reasonable."  Thus far, the Court has approved the fee applications for Debtor's counsel and the SBRA Trustee as reasonable with no objections raised. Section 1129(a)(4) is therefore satisfied.

#### 5.   Section 1129(a)(5)

Section 1129(a)(5) requires that "(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and (ii) *the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy*…" (emphasis added).  Although this section was not specifically raised by the Objecting Parties, "§ 1129(a) [nonetheless] obligates this Court to make a finding under § 1129(a)(5), whether or not any party has objected to the plan on § 1129(a)(5) grounds."  *In re Pearl Res. LLC*, 622 B.R. at 261.

Most of the Objecting Parties' arguments—albeit raised under other sections of the Code but also fitting under this requirement—surround their disapproval of the Plan for leaving Flagstad in charge of Debtor given his alleged bad faith in securing the preferred member majority status that he used to approve and initiate Debtor's bankruptcy filing and his allegedly conflicted relationship with Oxford Media and other insiders.  Broadly speaking, the question here under section 1129(a)(5) is whether the continuance of Flagstad in any leadership role for Debtor will be "consistent with the interests of creditors and equity security holders and with public policy."

The Objecting Parties have not come forth with persuasive evidence to show that Flagstad must be removed altogether from managing Debtor. The Court has already rejected their attempt to relitigate the underlying circumstances that led to the petition filing and arguments that Flagstad is unduly favoring Oxford Media or any of his other businesses from which Debtor purchases services. Contrast these facts to the case of *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr. S.D. Fla. 1993), where the court prohibited a manager from continuing in that capacity under section 1129(a)(5) after he diverted rents, violated court orders, made misrepresentations to secured creditors, commingled funds, and maintained a grossly inadequate accounting system. *Id.* Here, the Court is not faced with proof of similarly concerning conduct.

Nevertheless, the Court finds there is cause for concern about the lack of a defined management structure at Debtor involving someone other than Flagstad who can hold him accountable. At this point, Flagstad is currently the sole member of Debtor's Board of Directors, Debtor's CEO, and the self-declared "managing member and majority preferred member." With the departure of Olsen as "President" in June 2021, it is unclear who has assumed his myriad duties of running day-to-day operations for Debtor. Flagstad's testimony was not clear on this point either. None of the four remaining employees of Debtor—a marketing manager, developer, junior employee helping with revenue reporting, or the bookkeeper whose return is uncertain—appear to have management authority or the ability to hold Flagstad accountable. Of particular alarm to the Court, and the reason why the SBRA Trustee or another disinterested third-party must have a defined and prominent role with respect to Debtor's execution of payment duties under any plan, is the fact that Debtor may no longer have anyone in charge of accounting functions. Indeed, up until yesterday, Debtor last filed a monthly operating report in April 2022, for the period through February 2022, four months ago. Debtor just submitted the

report through March 2022, on July 18, 2022. *See* Dkt. #238. While Flagstad testified that

Debtor has remained profitable, the Court and other interested parties are entitled to inspect

documentation to substantiate that claim.

A proposed management structure that would allow Flagstad alone to continue to make

all business decisions with no outside oversight is a nonstarter. The Court recognizes that

Debtor was thrust into bankruptcy by entry of the $1.83 million state court judgment, a not-so-

uncommon occurrence faced by business debtors. But putting that judgment to the side, Debtor

still has another $2 million in additional unsecured debt and less than $300,000 in liquid assets.

Under Flagstad's leadership as CEO, and with Olsen having significant responsibility as

President and an active bookkeeper managing the finances, at least on paper, Debtor was barely

making ends meet. Even Flagstad filed a proof of claim for personal loans he provided to Debtor

of over $750,000. It does not bode well for Debtor's reorganization efforts if Flagstad is the only

high-level executive in charge.

Not only does the evidence in the record reflect that the current staffing may be

insufficient for Debtor to carry out operations successfully, but Flagstad himself testified that he

spends a majority of his working time at Oxford Media. Nowhere in the Code does it prohibit a

Debtor representative from concurrently operating other businesses. But doing so here under the

circumstances described above would severely reduce the amount of time that Flagstad can

commit to running Debtor in all the proposed capacities.

Even worse, Flagstad will still have to contend with the deteriorated relationship between

himself and Debtor's shareholders. Several state court lawsuits were filed against Flagstad and

Debtor pre-petition and many of the preferred members attempted to express their lack of

confidence in Flagstad's leadership by voting against the Plan. Continued contentious litigation

would further erode Flagstad's capacity to direct his energy into leading the charge at a reorganized Debtor.

Some of these concerns are indirectly addressed by the proposals in the SBRA Trustee's memorandum on confirmation. Although he voiced his verbal support for confirmation of "a plan" in this case, his memo also lays out three potential scenarios under which a confirmed plan might operate. These involve the appointment of a Plan Administrator who would have a range of authority from full control over all Debtor bank accounts and sole signing authority to no signing authority but responsibility for making disbursements.

It is not necessary at this juncture for the Court to determine which option, if any, is best. No evidence was presented at the hearing as to the propriety or legality of one proposal over another. The Court encourages Debtor to explore them all with the Objecting Parties and the SBRA Trustee in hopes of identifying an acceptable solution to allay the Court's legitimate concerns about Debtor putting all its eggs in Flagstad's basket at a time when he will be dealing with other pressing obligations. But to be clear, to satisfy section 1129(a)(5), any amended plan will need to specifically address Debtor's management structure, including but not limited to, the high-level position vacancies, Flagstad's potentially conflicting roles, and the provision of accounting services and financial controls. It is evident from the testimony on behalf of the Trust and from Klaas that continuing with Flagstad as the only person in charge of Debtor, the majority shareholder, and sole director, is inconsistent with "the interests of creditors and equity security holders and with public policy."

### 6. **Section 1129(a)(6)**

Section 1129(a)(6) requires approval of any rates charged by the Debtor from any governmental agency with authority over such rates.  Because no such agency has applicable authority in this case, this section is inapplicable.

### 7. **Section 1129(a)(7)**

Section 1129(a)(7), also known as the "best interests of the creditors" test, requires that any dissenting creditor receive at least as much in a plan as they would under a hypothetical chapter 7 liquidation.  As discussed *supra,* the Plan includes a liquidation analysis which is satisfactory.   Section 1129(a)(7) is therefore satisfied.

### 8. **Section 1129(a)(8)**

Under section 1191(b), this section is not applicable in a nonconsensual confirmation of a subchapter V case.

### 9. **Section 1129(a)(9)**

This section proscribes how various classes of claims are to be organized.  In the Plan, the class organization is straightforward with an administrative class, wage class, and three classes of creditors: secured, unsecured, and interest holders.  No objections to this classification scheme have been filed, and consistent with the analysis under sections 1129(a)(1) and 1122, it appears to be appropriate, pending clarification about which class the Klaas Claim will belong to in a future plan.  Section 1129(a)(9) is provisionally satisfied.

### 10. **Section 1129(a)(10)**

Under section 1191(b), this section is not applicable in a nonconsensual confirmation of a subchapter V case.

## 11. <u>Section 1129(a)(11)</u>

Section 1129(a)(11) imposes a "feasibility" requirement for a plan to be confirmed. For a plan to meet that standard, the court must determine that "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). To fulfill this requirement, Debtor need not demonstrate a "guarantee of the Plan's success," but rather "a reasonable assurance of commercial viability." *In re Aurora Memory Care, LLC*, 589 B.R. 631, 640 (Bankr. N.D. Ill. 2018) (internal quotation omitted).

The Court has already covered in detail the deficiencies in Debtor's management structure in its discussion of section 1129(a)(5), *supra*. However, a feasibility analysis is typically geared more strictly toward the financial viability of a plan—for example, by examining the cash flow of the debtor. *See, e.g., Matter of Canal Place Ltd. P'ship*, 921 F.2d 569, 579 (5th Cir. 1991).

Here, Debtor's monthly operating reports have thus far demonstrated the company's ability to continue operating successfully, by showing an increase in cash receipts, operating balance, and cash flow. The Plan also calls for Debtor to reject its lease for office space upon confirmation and switch to a fully remote workplace, which will further free up cash for operations. The SBRA Trustee took these financial projections into consideration when recommending that a plan be confirmed to allow Debtor to continue operating. The Court will reserve final judgment on this requirement until Debtor becomes fully current on operating reports. Barring any significant changes, Debtor has shown "commercial viability" and thereby satisfied section 1129(a)(11).

### 12. **<u>Section 1129(a)(12)</u>**

Section 1129(a)(12) requires payment of all applicable bankruptcy fees under section 1930 of title 28.   No objections were raised.  Because it appears that all applicable fees have been paid, section 1129(a)(12) is satisfied.

### 13. **<u>Section 1129(a)(13)</u>**

Section 1129(a)(13) deals with the continued payment of retiree benefits.  Because Debtor does not have retirement benefit obligations, this section is inapplicable.

### 14. **<u>Section 1129(a)(14)</u>**

Section 1129(a)(14) deals with domestic support obligations and is therefore inapplicable to Debtor.

### 15. **<u>Section 1129(a)(15)</u>**

Section 1129(a)(15) applies in instances where the debtor is an individual and is therefore inapplicable to Debtor.

### 16. **<u>Section 1129(a)(16)</u>**

Section 1129(a)(16) requires that all transfers of property under the plan shall be made in accordance with any applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation of trust.  Because no objections have been raised on this ground and the Plan does not run afoul of this provision, section 1129(a)(16) is therefore satisfied.

In conclusion, the applicable requirements under section 1129(a) have not been met and the Plan cannot be confirmed because it fails to satisfy section 1129(a)(2).  Debtor will be granted leave to file an amended plan for potential confirmation.  Given the likelihood that any

such future amended plan will remain nonconsensual, the Court will also analyze the requirements for "cramdown" confirmation under section 1191(b).

## B. <u>Confirmation of a Nonconsensual Plan Under Section 1191(b)</u>

Section 1191(b) delineates the rules for confirmation of a nonconsensual subchapter V plan. These requirements replace the "cramdown" requirements found in section 1129(b) which are inapplicable in a subchapter V case. A nonconsensual plan can be confirmed under section 1191(b) even without meeting the requirements of paragraphs (8), (10), and (15) of section 1129(a).

A bankruptcy court must confirm a subchapter V plan on request of the debtor if the plan meets the applicable requirements of section 1129(a), *and*, with respect to each impaired class that has not accepted it, the plan does not (1) discriminate unfairly and (2) is fair and equitable. 11 U.S.C. 1191(b). Subchapter V leaves in place the old standards for the "unfair discrimination requirement." However, for the "fair and equitable" requirement, section 1191(c) replaces the old definition found in section 1129(b).

### 1. <u>Unfair Discrimination</u>

When analyzing whether a plan discriminates unfairly, a court must determine whether (1) there is a legally acceptable rationale for such discrimination, and (2) whether the discrimination is necessary in light of the rationale. *In re 203 N. LaSalle St. Ltd. P'ship,* 190 B.R. 567, 585–86 (Bankr. N.D.Ill.1995). The question of unfair discrimination is a "horizontal comparative assessment applied to similarly situated creditors (here unsecured creditors) where a subset of those creditors is classified separately, does not accept the plan, and claims inequitable treatment under it." *In re Tribune Co.*, 972 F.3d 228, 232 (3d Cir. 2020).

Neither of the Objecting Parties advanced specific arguments relating to unfair discrimination at trial or in their post-trial briefs.  Still, as already noted, because the Klaas Claim will not be subordinated, but Flagstad has offered orally to subordinate his unsecured claim to everyone except Klaas, the Court is left in the dark as to how these developments will impact treatment of the Klaas Claim.  Klaas is now unambiguously "similarly situated" to the rest of the unsecured creditors in Class 2 but under Flagstad's proposal, they may be paid before Klaas, even though Klaas holds the largest unsecured claim.  Or it could be that Klaas will still receive his pro rata share.  The Court simply cannot tell.  Any future plan by Debtor will need to flesh out this issue and assure that the treatment does not discriminate unfairly by treating Klaas worse than similarly situated unsecured creditors.

The Court recognizes that the contemplated voluntary subordination by Flagstad would be undertaken in his capacity as a creditor.  Even so, "[t]he unfair-discrimination test . . . protect[s] the relative payments to same-rank creditor classes whose recovery have been affected, inter alia, by *intercreditor subordination agreements*."  *In re Tribune Co.*, 972 F.3d at 238 (emphasis added).  Therefore, Debtor will need to account for this change in an amended plan.

Aside from the subordination concern, the classification of claims by the Plan does not appear to present a risk of unfair discrimination among similarly situated creditors.

## 2.  <u>The Fair and Equitable Standard</u>

As mentioned, section 1191(c) restates the "fair and equitable" standard for treatment of unsecured creditors.[11]  A plan is fair and equitable if it commits all of the debtor's disposable

---

[11]  Subchapter V leaves intact the "fair and equitable" definition for treatment of secured creditors under §1129(b)(2)(A). In this case, however, there are no secured creditors, so that definition is inapplicable.

income for the entire term of the plan to making plan payments, *and either* that (i) the debtor will be able to make all plan payments, *or* (ii) there is a reasonable likelihood that the debtor will be able to make the payments *and* the plan provides appropriate remedies in the event the payments are not made. 11 U.S.C. § 1191(c)(2) and (3).[12]

### i.   Commitment of all Disposable Income

In his objection to confirmation, Klaas argued that the Plan fails to commit all disposable income to payments because it "does not include the cash on hand as disposable income."  He further questioned the increase in expenses for data and wages, as compared to the amounts spent pursuant to the cash collateral orders.  Although Klaas did not press these arguments much at trial, Flagstad offered this relevant testimony: "Q. So if there is cash in the bank at the time of confirmation, presumably there will be, that cash will be considered in the distributions as well, correct?  A. Correct. Yes."

Nothing in the Plan contradicts the baseline expectation that all cash on hand will be considered disposable income for purposes of making plan payments.  With respect to the amounts being committed to data and wages, the Court has already explained that paying Oxford Media a maximum of $60,000 a month for data is reasonable and found sufficiently credible Flagstad's unrebutted testimony about the need for Debtor's current employees and his plan to conservatively grow the business with additional staff.  As such, the Court is satisfied that the Plan adequately commits all disposable income to making payments for the life of the plan as required by section 1191(c)(2)(A).

---

[12] On June 21, 2022, the President signed into law the Bankruptcy Threshold Adjustment and Technical Corrections Act, Pub. L. No. 117-151.  Among other things, this Act amended section 1191(c)(3) to clarify that the "appropriate remedies" section applies in circumstances where a debtor can show a "reasonable likelihood" of being able to make payments, rather than showing that it "will" be able to make payments.  The amendment is retroactive, applying in cases (such as this one) commenced on or after March 27, 2020.  The parties submitted their post-trial briefs on the same day these amendments took effect.  The Court has engaged in an analysis under the new rubric.

### ii.  **Likelihood of Ability to Make Plan Payments**

Section 1191(c)(3)(A) requires that a debtor be able to make all payments under a Plan. Alternatively, section 1191(c)(3)(B)(i) allows the debtor to show a "reasonable likelihood" it will be able to make all payments.  While the Debtor has not definitely shown that it "will" be able to make payments, the Court reiterates its finding under section 1129(a)(11) that the continued ability of Debtor to operate profitably and increase its cash reserves demonstrates feasibility, including a "reasonable likelihood" of an ability to make plan payments.  Section 1191(c)(3)(B)(i) is therefore satisfied.

### iii.  **Remedies in the Event of a Default**

Section 1191(c)(3)(B)(ii) requires a nonconsensual plan to contain appropriate remedies for creditors in the event payments are not made.  Article VIII, Section 8.2 of the Plan addresses that requirement by stating "the particular claimant shall be entitled to pursue its remedies as are available to it pursuant to applicable law."  Klaas objects to that language as falling short of the applicable standard.  He is correct.

There is not much guidance on what this provision requires plans to include.   Another court within this Circuit has made the same observation.  *See In re Urgent Care Physicians, Ltd.*, 2021 WL 6090985 at *11 (Bankr. E.D. Wisc. Dec. 20, 2021) (explaining that there is "scant case law discussing what may constitute an appropriate remedy for a default under a Subchapter V plan").  But what is clear is that the language proposed by Debtor is deficient in that it offers no specific protections for unsecured creditors who are forced to forgo some of the standard protections of a typical chapter 11 case when debtors elect to proceed under subchapter V.  To assert that creditors can pursue remedies under applicable law if Debtor should default is a toothless remedy.

Debtor has over $4 million in unsecured claims, no real property, and less than $300,000

in cash and receivables.  Klaas is the largest unsecured creditor at nearly $2 million—half of that

debt—for a Debtor with few liquid assets.   By the time Debtor defaults, those assets would

likely be depleted, leaving unsecured creditors with no chance of recouping their losses.  That, in

turn, would spark the "race to the courthouse" that is contrary to the spirit and intent of the

bankruptcy policy of orderly distribution of limited assets.  Under these circumstances where the

objecting unsecured creditor bears a disproportionate amount of risk, Debtor could offer options

such as expedited liquidation of nonexempt assets, or a truncated process for declaring a default

and allowing collections to begin, or immediate conversion to allow a chapter 7 trustee to take

over business operations and possibly conduct a winddown and liquidation.  *Compare In re*

*Ellingsworth Residential Cmty. Ass'n, Inc.*, No. 6:20-bk-01346-KSJ, 2021 WL 6122645, at *2

(Bankr. M.D. Fla. Oct. 16 2020) (deeming sufficient the debtor's default remedy providing "for a

ten day cure period, and should the Debtor fail to cure, the claimholder may seek relief from this

Court to enforce the Plan or seek relief available under federal or applicable state law"); *In re*

*Urgent Care Physicians, Ltd.*, 2021 WL 6090985 at *11 (finding debtor's proposed default

remedy providing that "the case will remain open and those creditors may seek relief in this

Court based on the debtor's default under the plan" to be satisfactory).

Most debtors and creditors negotiate acceptable terms.  The Court encourages Klaas and

Debtor to work with the SBRA Trustee to reach a consensus on appropriate language to satisfy

section 1191(c)(3)(B).  What Debtor has proposed will not be approved.

## Conclusion

For the foregoing reasons, the Plan filed by Debtor Channel Clarity Holdings

LLC on September 9, 2021 (Dkt. #62) does not meet the requirements for nonconsensual

confirmation in a subchapter V case under chapter 11.   Therefore, Debtor is granted

leave to file an amended plan consistent with this decision within 45 days of entry of this

Order.  The case is set for a status hearing on confirmation of an amended plan on

September 15, 2022, at 11:00AM on Zoom for Government.


ENTER:

Dated:  July 19, 2022


Honorable LaShonda A. Hunt
United States Bankruptcy Judge